UNITED STATE DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SHAWN DEERFIELD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 07-C-1996 |
| v. | ) | |
| | ) | Magistrate Judge Michael T. Mason |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Michael T. Mason, United States Magistrate Judge:

Plaintiff Shawn Deerfield ("Deerfield" or "claimant") filed a motion for summary

judgment seeking judicial review of the final decision of the Commissioner of Social

Security (the "Commissioner") denying his claim for disability insurance benefits under

the Social Security Act, 42 U.S.C. §§ 416(i) and 423.  Claimant asks this Court to

reverse the decision of the Administrative Law Judge ("ALJ") and award benefits or,

alternatively, remand for further proceedings.  The Commissioner filed a cross-motion

for summary judgment requesting that this Court uphold the ALJ's decision.  Jurisdiction

to review this matter is proper pursuant to 42 U.S.C. § 405(g).  For the reasons set forth

below, Deerfield's motion for summary judgment is granted in part and denied in part,

the Commissioner's motion is denied, and this case is remanded for further proceedings

consistent with this Opinion.

**I.    PROCEDURAL HISTORY**

Deerfield filed an application for disability insurance benefits on October 20,

2003.  (R. 66-68).  In a disability report completed a month earlier, Deerfield claimed a disability due to anxiety disorder with panic attacks, attention deficit disorder and obsessive compulsive disorder dating back to June 15, 1999.  (R. 78-79).  The Social Security Administration denied Deerfield's claim on February 11, 2004, and again upon reconsideration on July 29, 2004.  (R. 44).  Deerfield then filed a timely written request for a hearing.  (R. 49).  On February 2, 2006, claimant appeared with representation at a hearing before Administrative Law Judge Richard J. Boyle ("ALJ Boyle").  (R. 235-67).  ALJ Boyle issued a decision denying Deerfield's claim for benefits on August 24, 2006.  (R. 20-26).  The Appeals Council denied claimant's request for review, and the ALJ's decision became the final decision of the Commissioner.  *Zurawski v. Halter*, 245 F.3d 881, 883 (7th Cir. 2001). Claimant subsequently filed this action.

## II.    BACKGROUND

### A.    Medical History

Deerfield submitted various medical records in support of his claim for benefits.  (R. 123-214).   The earliest of those records memorializes Deerfield's call to E.A. Perakis, M.D. ("Dr. Perakis"), a psychiatrist, on April 1, 1999.  (R. 167).  According to Dr. Perakis' records, claimant cancelled his appointment "because he had to go into work but indicated that he is doing well and he will continue on the current dosage of Serzone." (*Id.*).  On May 3, 1999, claimant appeared for his scheduled appointment and informed Dr. Perakis that he was not experiencing any significant side effects from Serzone.  (*Id.*).  He also reported that "his anxiety continues to be a problem although the sleep has improved." (*Id.*).  On June 7, 1999, claimant returned to Dr. Perakis and

reported that he continued to struggle with intense feelings of anxiety and difficulty relaxing. (*Id.*). Dr. Perakis prescribed Serzone and Buspar, but instructed claimant to start Buspar "only if he does not respond to the increased dosage of the Serzone." (*Id.*).

On July 12, 1999, Dr. Perakis noted that claimant is currently "on the Serzone 150 mg BID[1] since the higher dosage simply did not seem to be beneficial." (R. 166). Claimant reported that he was "tolerating the Buspar 15 BID" and his depression had improved from a two to an eight on a scale of zero to ten, but his anxiety remained at a two. (*Id.*). Dr. Perakis opined that Deerfield seemed "relatively stable" at that time. (*Id.*).

During his August 16, 1999 appointment, claimant reported that he discontinued his Buspar "because he was not seeing the benefit of the medication." (R. 166). He also described "constant tension during the daytime" and bruxism, or gnashing of his teeth, at night. (*Id.*). Dr. Perakis prescribed Valium and recommended further evaluation in one month. (*Id.*). Claimant returned for further treatment on September 13, 1999, and reported that the Valium "simply was not helpful." (*Id.*). He also stated that he "was still waking up in the morning feeling as though he was extremely tense and he felt that his jaw was still clenched and that he may have been grinding his teeth during the night." (*Id.*). Dr. Perakis discontinued claimant's Valium and added Klonopin at a dosage of 1 mg BID. (*Id.*). On October 4, 1999, claimant reported that Klonopin "simply ha[d] not been effective in reducing his overall level of anxiety." (R. 165).

---

[1]BID stands for "bis in die," which in Latin means twice a day.

Deerfield also stated that "he has been clean from marijuana now for over a year . . . [and] is frustrated that his anxiety has not improved." (*Id.*). Dr. Perakis referred claimant for a second opinion and noted Deerfield's "desire to go through his HMO and find a psychiatrist there to pursue further consultation and treatment." (*Id.*). Consistent with this plan, Dr. Perakis noted "[f]ollow up with me will be on an as needed basis only." (*Id.*).

On November 16, 1999, claimant received treatment from Steven J. Resis, M.D. ("Dr. Resis"). (R. 123-24). Deerfield reported that "he was previously suicidal and that ha[d] essentially remitted," but continued to suffer from chronic underlying anxiety. (R. 123). He also complained of occasional panic attacks, "most often while giving a performance," and "significant problems with sleep disturbance off and on throughout much of his life." (*Id.*). Finally, Deerfield stated that he "quit his most recent job due to it not being financially rewarding." (*Id.*). Dr. Resis diagnosed claimant with: "1. Major Depression, single episode of moderate severity. 2. History of anxiety disorder [not otherwise specified]. [Rule out] panic disorder with mild agoraphobia. 3. History of psychoactive substance abuse in past, primarily marijuana." (R. 124). The doctor changed claimant's Serzone to 450 mg at bedtime and continued his current dose of Valium. (*Id.*).

According to the record, Deerfield returned to Dr. Resis approximately six months later, on May 30, 2000. (R. 136). At that time, Deerfield was "doing well," although struggling with his wife and son and "some ongoing depressive symptoms." (*Id.*). Claimant did not appear for his scheduled appointments on July 25, 2000, September

12, 2000, and September 19, 2000.  (R. 136-37).  Claimant returned to Dr. Resis' office on October 24, 2000 and reported "doing reasonably well" and "ongoing problems with memory and concentration." (R. 135).  Dr. Resis recommended an attention deficit disorder ("ADD") assessment.  (*Id.*).

The medical records indicate that claimant next received treatment from Dr. Resis approximately three months later, on January 16, 2001.  (R. 133).  At that time, claimant reported unexplained weight gain.  (*Id.*).  Dr. Resis recommended a thyroid-stimulating hormone test and instructed claimant to follow up in three months.  (R. 133).  During his next appointment, on April 16, 2001, Deerfield complained of "increased symptoms of depression with some racing thoughts and buzzing in his head making it impossible for him to sleep at night" over the "last several weeks." (R. 137).  Dr. Resis opined that claimant "appears to be somewhat hypomanic by history" and recommended that he participate in a trial of Depakote and follow up in a month.  (*Id.*).  Claimant returned for treatment on May 14, 2001 and reported nausea from Depakote that had subsided with time.  (R. 134).  Dr. Resis recommended that claimant continue his (then) current medication regime and follow up in two months.  (*Id.*).

Approximately three months later, on August 17, 2001, claimant returned for further treatment and reported a recent job loss and "increased irritability." (R. 134).  On December 18, 2001, claimant sought treatment for significantly increased anxiety, which he described as separate from his depression and "an issue since childhood." (*Id.*).  Dr. Resis elected to gradually lower and possibly discontinue claimant's Wellbutrin,[2] and

---

[2]The record before this Court does not show when claimant was first prescribed Wellbutrin.

prescribed "Risperdal due to severe anxiety, which has been unrelieved by Valium." (*Id.*). On January 14, 2002, claimant reported that his anxiety had "diminished somewhat significantly" due to the Risperdal, but he experienced "significant multiple side effects" including weight gain, sleep disturbance and mood instability. (*Id.*). Consequently, Dr. Resis decided to wean claimant off Risperdal and replace it with Topamax. (*Id.*). On February 11, 2002, Deerfield reported "significant improvement on the Topamax" including, coincidentally, a lost desire to smoke cigarettes. (*Id.*).

During his next appointment, on March 11, 2002, claimant reported an inability to tolerate Topamax "due to nausea throughout the day and feeling more anxious on it." (R. 132). As a result, Dr. Resis discontinued the Topamax and prescribed Seroquel. (*Id.*). On April 15, 2002, claimant reported that his anxiety was "100 times worse" than his depression. (*Id.*). Claimant revealed that he was somewhat paranoid when driving and at the grocery store. (R. 132). As a result of these comments, Dr. Resis increased claimant's Seroquel to 300 mg a day. (*Id.*). On April 26, 2002, Deerfield reported "no side effects but no significant reduction in his anxiety since taking 300 mg of the Seroquel." (*Id.*). Dr. Resis increased the prescription for Seroquel to 900 mg a day on May 31, 2002. (*Id.*). During that appointment, claimant denied any side effects other than occasional muscle clenching, which he described as "an ongoing problem even before the medication." (*Id.*).

Claimant returned to Dr. Resis for additional treatment on June 24, 2002. (R. 132). He reported a recent hospitalization due to pain in his rib cage. (*Id.*). Dr. Resis decided to transition claimant from Seroquel to Paxil and gradually lower the Serzone

over the next one to three months.  (*Id.*).  On July 29, 2002, claimant reported "no improvement with anxiety since increasing the Paxil to 25 mg approximately three weeks ago."  (R. 131).  Dr. Resis then increased claimant's Wellbutrin to 400 mg a day as tolerated and his Paxil to a maximum of 50 mg, and prescribed a "trial" of Viagra.  (*Id.*).  Claimant also reported minimally elevated blood pressure controlled with medication.  (*Id.*).

On August 26, 2002, Deerfield informed Dr. Resis that he was "struggling with some depression and intense anxiety," and had received "no benefit" from the Paxil.  (R. 131).  Dr. Resis prescribed Trazodone and Haldol and instructed claimant to follow up in one month.  (*Id.*).  Claimant subsequently cancelled his September 23, 2002 appointment.  (*Id.*).

On October 25, 2002, a Registered Nurse at the Alexian Brothers Behavioral Health Hospital assessed claimant's condition.  (R. 140-41).  Deerfield presented with complaints of low energy, poor concentration, mood swings, racing thoughts, buzzing sounds in his head, and anxiety that lasted all day and increased in public.  (R. 140).  He reported that "anxiety rules his life."  (R. 141).  Also on October 25, 2002, Gregory Teas, M.D. ("Dr. Teas") performed a psychiatric evaluation.  (R. 142-43).   Dr. Teas diagnosed claimant with generalized anxiety disorder and referred him to psychotherapy.  (*Id.*).  The doctor also assigned claimant an Axis V Global Assessment of Functioning ("GAF") score of 49.  (R. 142).  During that office visit, Deerfield completed a client questionnaire.  (R. 144-48).  In that questionnaire, claimant stated that he was seeking help for depression and anxiety, and identified the following

medications as drugs he was taking or had taken in the past six months: Lipitor, Depakote, Wellbutrin, Serzone, Paxil, Trazodone, Risperdal, "Sevaquil," Topamax, and Haldol, plus "more I'm sure." (R. 144-45).

Dr. Teas' notes indicate that claimant called his office on October 29, 2002 and complained of "intense nausea" from Anafranil started on October 25, 2002. (R. 156). Claimant called again on October 31, 2002 and reported continued nausea. (*Id.*). Claimant returned for further treatment on November 25, 2002. (R. 155). He requested Valium for social anxiety and stated that he can "never relax" and has been "chewing up" his lips. (*Id.*). A related progress note indicates that claimant had stopped taking Wellbutrin. (*Id.*). On December 31, 2002, claimant reported that he "has gotten off Depakote completely and has not benefitted from Anafranil up to [a] maximum of 200 mg daily." (R. 154). Dr. Teas continued claimant's Valium and added Gabitril 4 to 32 mg daily. (*Id.*). On February 3, 2003, Deerfield called Dr. Teas' office to report that Gabitril caused significant side effects and that he could not tolerate more than 8 mg daily. (R. 153).

Deerfield returned to Dr. Teas on March 7, 2003 and reported that he had "become much more depressed," was "[t]he worse in four years and ha[d] fleeting thoughts of suicide." (R. 152). According to claimant, the "only thing that works is Valium . . . and Neurontin," although with Neurontin he "feels no benefit or side effects." (*Id.*). Claimant also reported a number of serious stressors and trouble sleeping. (*Id.*). Dr. Teas prescribed 150 mg of Effexor along with five extra mg of Valium, and reduced claimant's Neurontin dosage. (*Id.*). A handwritten note on the progress report states

"cannot afford therapy." (*Id.*).

On April 4, 2003, claimant told Dr. Teas that he "has started to recover to a degree," sleeps 7-8 hours a night, and "feels there is hope for a change." (R. 151). Deerfield also reported that he is irritable and easily angered, and rated himself as a 3/10. (*Id.*). Dr. Teas noted that Deerfield was willing to increase his dose of Effexor or augment with Wellbutrin. (*Id.*). The doctor elected to increase claimant's Effexor to 225-300 mg as tolerated. (*Id.*).

Claimant returned to Dr. Teas on September 16, 2003 and reported that he "has been off Effexor for some time and is just taking Valium daily." (R. 150). Claimant also stated that he continues to suffer from panic spells and "feels that no treatment has helped." (*Id.*). Dr. Teas noted that claimant was "not interested" in ADD medications even though they provided "some level of improvement in the past." (*Id.*). Three months later, on December 15, 2003, Dr. Teas again noted that Deerfield "has been just taking Valium daily and has no real desire to use other medications." (R. 149). During that appointment, claimant relayed that he was "burned out" on the available treatment options and declined to try MAOI (Monoamine Oxidase Inhibitors) or Keppra. (*Id.*). Dr. Teas opined that there was no clinical change in claimant's condition and noted "some situational depression." (*Id.*).

On December 18, 2003, Dr. Teas completed a Residual Functional Capacity ("RFC") assessment of claimant. (R. 168-75). Dr. Teas indicated that he had treated claimant every two to three months since October 25, 2002. (R. 168). Based on that treatment, Dr. Teas diagnosed claimant with panic disorder and generalized anxiety

disorder, and assigned an Axis V GAF score of 55.  (*Id.*).  Dr. Teas identified the following signs and symptoms associated with this diagnosis: sleep disturbance, mood disturbance, recurrent panic attacks, difficulty thinking or concentrating, social withdrawal or isolation, decreased energy, generalized persistent anxiety and fear of leaving home.  (R. 169).  The doctor noted that claimant "failed to respond to several anti depressants" and was currently taking 15 mg of Valium a day.  (R. 170).  He found that Deerfield's impairment could be expected to last at least twelve months and would cause him to be absent from work more than three times a month.  (R. 170-71).

When asked to relate the particular medical findings to any limitations in claimant's capacity to do unskilled work, Dr. Teas classified the following mental abilities and aptitudes as "unlimited or very good": remember work-like procedures; understand, remember and carry out very short and simple instructions; make simple work related decisions; work in coordination with or in proximity to others without being unduly distracted; get along with co-workers; ask simple questions or request assistance; and be aware of normal hazards and take appropriate precautions.  (R. 172-73).  In addition, he classified claimant's ability to maintain attention for two hour segments, sustain an ordinary routine with special supervision, accept instructions, respond appropriately to criticism, and respond appropriately to changes in routine work settings as "good."  (*Id.*).  Finally, Dr. Teas classified claimant's ability to maintain regular attendance and be punctual, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a constant pace without an unreasonable number and length of rest periods, and deal with normal work stress as "fair."  (*Id.*).

Dr. Teas classified all of claimant's mental abilities and aptitudes needed to do semiskilled and skilled work as "unlimited or very good" or "good." (R. 173). When asked to opine on claimant's mental abilities and aptitudes needed to do particular types of jobs, the doctor classified claimant's ability to travel in unfamiliar places and use public transportation as "poor or none." (R. 174). Dr. Teas also opined that claimant had "slight" restrictions of daily living; "marked" difficulties in maintaining social functioning; "frequent" deficiencies of concentration, persistence or pace resulting in a failure to complete tasks in a timely manner; and "continual" episodes of deterioration or decompensation in work or work-like settings. (*Id.*). Finally, Dr. Teas opined that claimant's symptoms were not related to ongoing drug and alcohol abuse. (R. 175).

The record also includes a psychological evaluation performed for the Bureau of Disability Determination Services (the "DDS") by William N. Hilger, Ph.D. ("Dr. Hilger"), a registered clinical psychologist, on January 8, 2004. (R. 176-180).[3] Dr. Hilger reviewed Dr. Resis' treatment records and performed a one-hour evaluation of claimant. (R. 176). During that evaluation, Deerfield reported that he has been "secluded to his house for an anxiety disorder that has been occurring for the past three years but has likely been going on since his childhood," and suffers from panic attacks that make him feel "as if he will pass out and that he is losing his hearing or is dying." (R. 176). He also reported difficulty sleeping. (R. 177). Dr. Hilger diagnosed claimant with agoraphobia, panic attacks that are uncontrolled with medication, obsessive-compulsive

---

[3]Claimant's date last insured was December 31, 2003. (R. 21). Thus, in order to receive benefits, claimant must establish that he was under a disability as of that date. 20 C.F.R. § 404.130.

disorder that is also uncontrolled with medication, and untreated attention deficit hyperactive disorder of the inattentive type. (R. 180). He noted that claimant had poor mental potential due to his high anxiety and other mental and emotional problems that affected his memory, concentration, persistence, social interaction and adaptation. (R. 180). Dr. Hilger "strongly recommended [that claimant] pursue an alternative course of treatment with a psychologist specializing in anxiety disorders who could provide psychotherapeutic and behavioral management treatment" and "try some new medications to treat the attention disorder." (*Id.*). He opined that if claimant's mental state could be stabilized and improved, claimant would appear to have good mental potential to resume normal competitive employment. (*Id.*).

On January 29, 2004, John T. Tomassetti, Ph.D. ("Dr. Tomassetti") reviewed claimant's file on behalf of the DDS and competed a "Psychiatric Review Technique Form." (R. 181-94). Dr. Tomassetti noted that claimant suffered from psychological or behavioral abnormalities, specifically ADHD and anxiety-related disorders. (R. 182, 186). Dr. Tomassetti recognized evidence of "generalized persistent anxiety" accompanied by autonomic hyperactivity, apprehensive expectation, and vigilance and scanning; recurrent severe panic attacks; and recurrent obsessions or compulsions which are a source of marked distress. (R. 186). He also noted impairments of agoraphobia and OCD. (*Id.*). Dr. Tomassetti did not offer an opinion as to any related functional limitations or set forth the degree of limitation. (R. 191). However, he did conclude that "evidence does not establish the presence of the 'C' criterion" for the listed impairment of "Anxiety-Related." (R. 192).

Dr. Teas completed a second RFC evaluation on January 27, 2006. (R. 207-14). In this second RFC evaluation, Dr. Teas diagnosed claimant with generalized anxiety disorder and found that claimant had a GAF score of 56. (R. 207). Dr. Teas again opined that claimant's impairment could be expected to last at least twelve months and require him to miss work an average of more than three times a month. (R. 209-10). The doctor concluded that claimant had "moderate" restriction of activities of daily living; "marked" difficulties in maintaining social functioning; "often" experienced deficiencies of concentration, persistence or pace resulting in a failure to complete tasks; and could expect "repeated" episodes of deterioration or decompensation in work or work-like settings. (R. 213). Dr. Teas found claimant had no ability to understand and remember detailed instructions. (R. 212). The doctor noted that claimant's medications included Serzone and Valium, and he "cannot afford psychotherapy." (R. 209). Finally, Dr. Teas opined that claimant's prognosis is "poor," citing no improvements in three years. (*Id.*). In an accompanying cover letter, Dr. Teas opined that claimant is "unlikely to succeed in full time employment." (R. 206).

### B.    Claimant's Testimony

Claimant appeared and testified at the February 2, 2006 hearing before ALJ Boyle. (R. 237-62). Deerfield was born February 27, 1967. (R. 241). As of the hearing, claimant was 5'10 and weighed approximately 240 pounds. (R. 241-42). He lived with his 25-year-old son in Schaumburg, Illinois. (R. 241). Deerfield stated that his wife left him six months ago, but they hadn't started divorce proceedings yet. (*Id.*).

Deerfield acknowledged that he has a history of learning problems and, as a

child, was enrolled in special needs courses and group therapy. (R. 261). He dropped out of high school as a sophomore, but later obtained his GED and attended bartending school. (R. 242).

Claimant testified that he worked in the mail room at Baxter, and then in the mail room at Fujisawa. (R. 245). Both jobs required claimant to be on his feet all day and to lift around 30 pounds. (*Id.*). Deerfield testified that he "got out of that job when [his] ability to work as fast as the people around [him] . . . deteriorated . . . and went into bartending." (R. 246). Deerfield began working for Labor Enterprises in 1991. (R. 243-44). He worked as a bartender for the first year, and then as an assistant manager for "several years." (R. 244). Claimant was promoted to head manager of six or seven employees for the "final portion of that job." (*Id.*). He did not do any payroll type work, but was required to "make out the schedule for [his] employees." (*Id.*). Both the bartending and management job required "some lifting," including lifting cases of liquor that weighed "maybe 50, 60 pounds." (*Id.*).

Deerfield stated that after his employment at Labor Enterprises ceased, he attempted "three different bartending jobs," but "lost each one of them." (R. 246). According to claimant, as his "ability to focus and concentrate got worse and as [his] anxieties got worse . . . [he] could no longer keep track o[f] what the customers let alone the waiters, waitresses were ordering . . . and [he] just became unable to function." (R. 246). Claimant's last job was at Amber's Char House. (R. 262). That job "lasted for about seven months" and his employers were friends who "knew about [his] problems." (*Id.*). Nevertheless, claimant was let go in October 2001 due to customer complaints.

14

(*Id.*).  "It's the same as all the other jobs . . . the staff as well as the patrons are complaining about me because I'm unable to remember what, I just don't, I'm not functioning the way I should be."  (*Id.*).

According to Deerfield, his four-year-old granddaughter stays with him for "half the week."  (R. 250).  On a typical day, he wakes up around 8:30 or 9:00, makes coffee and "wash[es] the dishes from the night before."  (R. 252).  He tries to keep his home "half way clean," does laundry every two weeks, and regularly feeds his cats and changes their litter box.  (R. 253).  Deerfield gets dressed every day, but not "the way [he'd] want to dress if [he] was going out."  (*Id.*).  Claimant occasionally suffers from insomnia.  (R. 254).

Deerfield testified that he does not take walks.  (R. 253).  His condition limits him to leaving his house once every couple of weeks.  (R. 255).  Claimant's friends will occasionally visit his home.  (R. 250).  Although Deerfield is licensed to drive, he only drives a couple times a month.  (R. 242).  Deerfield stated that he drives to the grocery store in order to shop in the middle of the night when fewer people are around.  (R. 248-49).  He shops at Wal-Mart and Food for Less, but avoids malls.  (R. 249).  He does not go out to eat.  (R. 251).  If Deerfield's cats have medical problems, his son takes them to the vet.  (R. 253).

Although claimant is a "big fan of movies," he no longer watches movies in the theater.  (R. 250-51). Deerfield explained that he has "trouble" with movies and must "rewind, watch it, and see it again over and over to grasp what [he's] seeing or [he'll] lose track of the stories."  (R. 251).  He does watch an average of four hours of

television per day.  (R. 252).  Deerfield stated that he's lost his ability to read.  (*Id.*).  He is capable of talking on the telephone and emailing.  (R. 249, 252).

Claimant suffers from panic attacks.  (R. 255).  He could not pinpoint the trigger for his panic attacks, and described them as "completely unpredictable."  (*Id.*).  According to claimant, the panic attacks begin without warning, he "just instantly start[s] profusely sweating . . . sweating all over and then . . . start[s] to feel nausea."  (*Id.*).  The attacks are occasionally, but not always, accompanied by vomiting.  (*Id.*).  Then, claimant "lose[s] the ability to hear, [and hears], a muffled sound like [his] hearing is going, and on many occasions [he] just hit[s] the floor at that point."  (R. 255-56).  Claimant does not know how long the panic attacks last.  (R. 256).

Deerfield testified that his last panic attack occurred "about three months ago."  (R. 258).  "The last time . . . was at a day time visit to the grocery store where [he] . . . ended up on the floor vomiting."  (R. 255).  Claimant recalled a similarly intense panic attack that also caused him to vomit brought on by "feeling something on [his] rib cage . . . like a bump" that caused him to "right away" suspect that he had cancer.  (R. 259).  Claimant stated that the frequency of his panic attacks ranges from twice a week to none for several months.  (*Id.*).  He suffered from "about a dozen" panic attacks "over a several month period" after his wife left him.  (*Id.*).

When asked to explain references in his medical records to obsessive compulsive disorder, Deerfield stated that he "tend[s] to worry about things like death and dying, there's cancer, just big things tend to fill [his] day in worry."  (R. 254).  He

recalled speaking with "Dr. Tesse"[4] on several occasions about his fear of driving and road rage, and stated that the doctor "used that OCD term" on several occasions. (R. 254-55). Claimant does not believe he suffers from OCD, and denied engaging in any ritualized counting or washing. (R. 257-58). He recalled telling his doctor about a "problem with constantly clicking [his] teeth," but stated that's "not something that . . . happens . . . too much anymore." (R. 258). Deerfield clarified that "[t]he clicking and the clenching still happen, but [he] do[es]n't . . . count like [he] used to, but [he] did . . . hear a number in [his] head, one two, three, four, five . . ." (*Id.*).

Claimant stated that he's been in "constant treatment for about seven or eight years" and has "never been off of medication." (R. 260). According to claimant, his doctor is "unable to treat [him] with medication at this point," and therefore he only sees his doctor for refills of Serzone and Valium. (R. 246-47). Claimant explained that Serzone was helpful for the "most part" in treating his depression. (R. 247). Deerfield also stated that Valium "at times helps with [the] panic attacks," but makes him drowsy. (*Id.*).

As of the hearing date, claimant was not receiving counseling or seeing a therapist. (R. 247). He last saw Dr. Teas "five or six months ago." (*Id.*). Claimant saw a second psychiatrist, Dr. Resis, who recommended that he see a social worker. (*Id.*). Deerfield stated that Dr. Resis "was going to help [him] with self hypnosis, things like that to help [him] relax or whatever, [but they] weren't able to get anywhere with that so

---

[4]Because there are no records from a Dr. Tesse, we presume that claimant actually testified about his conversations with Dr. Teas.

Dr. Resis ended that after several months." (*Id.*).

### C. Medical Expert's Testimony

Dr. David Bascardi ("ME Bascardi") testified as a medical expert at the hearing. (R. 263-66). In connection with his testimony, the ME reviewed claimant's treatment for anxiety problems and depression dating back to 1999. (R. 263). ME Bascardi described Dr. Hilger's diagnosis of OCD as "inappropriate." (*Id.*). However, he had "no problem" with the diagnosis of sleep disturbance, mood disturbance, panic attacks, difficulty thinking and concentrating, social withdrawal, decreased energy and generalized persistent anxiety. (R. 263-64).

ME Bascardi opined that this case required additional "development." (R. 263). He found a "lack of objective evidence  for almost two years" and an RFC that did not "provide objective findings on which to determine severity." (R. 264). The ME noted that the "last objective findings would suggest that claimant does have some problem with short term memory," but those are "a couple of years" old and need to be updated. (R. 265). ME Bascardi recommended a detailed "mental status exam" by a psychologist including IQ testing as well as a "most crucial" Wechsler Memory Scale assessment. (R. 265-66). As a result of Dr. Bascardi's testimony, ALJ Boyle arranged for the suggested testing to be administered. (R. 266).

### D. Wechsler Scale Assessments

On March 27, 2006, Randy L. Kettering, Ph.D. PC ("Dr. Kettering") administered the Rey test, Wechsler Memory Scale-III ("WMS-III") assessment and Wechsler Adult Intelligence Scale ("WAIS-III") assessment and completed a disability evaluation of

claimant. (R. 218-28). Dr. Kettering observed that during the tests claimant would "carry on a conversation under his breath verbalizing his mental problem solving process" and "appeared adequately motivated to do his best on the various tasks presented." (R. 218). However, Dr. Kettering also noted that in responding to the Rey test, an initial screening for motivation, claimant remembered only six out of fifteen items, "raising grave doubt as to the acceptable level of motivation to do his best particularly since there is no record that he was ever diagnosed or treated for a severe brain injury." (R. 219).

According to Dr. Kettering, claimant's overall performance on the WAIS-III indicated "that his current intellectual function can be classified in the Low Average range." (R. 219). Claimant had verbal IQ of 91, a performance IQ of 75 and full scale IQ of 83. (*Id.*). Claimant's WMS-III results were all below the mean score of 100. (R. 220).

Dr. Kettering also performed a mental status examination. (R. 222-25). During that exam, Deerfield admitted that he had not been taking Valium as prescribed but only when he "think[s] [he] might need it." (R. 222). He reported "good sleep" for the past six months, generally between 11 p.m. and 9 a.m. (*Id.*). Dr. Kettering noted that Deerfield "spends much of his time checking his email and using the computer for gaming and social activities." (R. 223). He also noted that claimant "has an affinity for the computer. He uses his to access news and to converse online in various chat rooms." (*Id.*). Claimant reported a "love" of musical theater and stated that "in the past few years he has attended performances of Phantom of the Opera, Starlight Express

and Miss Saigon.  He is particularly entranced with Les Miserable which he has seen on numerous occasions.  He has attended these in venues such as the Marriott Lincolnshire and the Cadillac theater in downtown Chicago." (*Id.*).  Dr. Kettering diagnosed claimant with panic disorder with agoraphobia (Axis I).  (R. 225).  He noted that "attending numerous musical plays in socially crowded venues while traveling long distances from home would appear to be contradictory with this diagnosis.  Although it may be that his medical treatment was more effective than described." (*Id.*).  The doctor also diagnosed claimant with personality disorder (Axis III) and assigned him a GAF score of 70 (Axis V).  (*Id.*).

In connection with his assessment of claimant's abilities, Dr. Kettering completed a "Medical Source Statement of Ability to do Work-Related Activities (Mental)."  (R. 226-28).  In that report, Dr. Kettering opined that claimant had no restrictions for the following work-related mental activities: ability to understand and remember short, simple instructions; ability to carry out short, simple instructions; and the ability to make judgments on simple work-related decisions.  (R. 226).  However, he found "moderate" restrictions on claimant's ability to understand and remember detailed instructions.  (*Id.*).  Dr. Kettering opined that claimant's "mental status judgment appears fine." (*Id.*).  He further explained that claimant "was able to attend the appointment at [a] new location on time and alone," and "was able to follow instructions and only required repetition on arithmetic . . . problems." (*Id.*).  Finally, Dr. Kettering concluded that claimant's impairments would not affect his ability to respond appropriately to supervision and work pressures in a work setting.  (R. 227).

### E. Additional Documentation

The record includes additional documents submitted by Deerfield's counsel after the hearing. On March 4, 2004, Deerfield's counsel submitted a questionnaire, completed by claimant, summarizing his recent medical treatment and medications. (R. 117-19). In that questionnaire, claimant stated that he is currently taking Serzone to control perspiration and Valium to "help with panic attacks." (R. 118). Deerfield also submitted a letter from his attorney setting forth various arguments in support of the claim for disability insurance benefits. (R. 120-22).

Following the ALJ's denial of his claim for benefits, Deerfield submitted a letter from his attorney and accompanying affidavit to the Appeals Council. (R. 229-34). In that affidavit, dated October 26, 2006, Deerfield stated that Dr. Kettering did not ask him when he saw the musicals. (R. 234). He further stated that he "only attended…5 shows in the past 15 years" and had "not seen any production on numerous occasions." (R. 234). He further averred that before attending the most recent musical - Les Miserable two years prior - he "was nervous and had anxiety for days," and took a tranquillizer. (*Id.*).

## III.   STANDARD OF REVIEW

The ALJ's decision will be affirmed if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence means more than a scintilla of evidence and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (*quoting Richardson v.*

*Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1421 (1971)). This Court must consider the entire administrative record, but we will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (*quoting Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)). We will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." *Lopez,* 336 F.3d at 539 (*citations omitted*). The ALJ need not discuss every piece of evidence in the record, but "must build an accurate and logical bridge from the evidence to [his] conclusion." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); *see also Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (*per curiam*) (holding that the ALJ must sufficiently articulate his assessment of the evidence to "assure us that the ALJ considered the important evidence . . . and to enable us to trace the path of the ALJ's reasoning.") (*quotations omitted*). If the ALJ's decision lacks an adequate discussion of the issues, it will be remanded. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

## IV.     ANALYSIS UNDER THE SOCIAL SECURITY ACT

In order to receive disability insurance benefits, a claimant must be "disabled" under the Social Security Act (the "Act"). A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). In determining whether a claimant is

disabled, the ALJ must consider the following five-step inquiry: (1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether he can perform past relevant work; and (5) whether the claimant is capable of performing any work in the national economy. *Dixon,* 270 F.3d at 1176. The claimant has the burden of establishing a disability at steps one through four. *Zurawski,* 245 F.3d at 885-86. If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Id.* at 886.

ALJ Boyle applied these five steps. At step one, the ALJ found that claimant did not engage in any substantially gainful activity between June 15, 1999 and December 31, 2003, the date last insured, as claimant's work attempts as a bartender prior to 2002 were unsuccessful. (R. 21). At step two, the ALJ found that claimant had a severe impairment limiting his mental ability to do basic work under 20 C.F.R. § 404.1520(c). (R. 22). Next, at step three, ALJ Boyle found that claimant did not have an impairment or combination of impairments that met or equaled any listing as of December 31, 2003. (*Id.*). ALJ Boyle then found that claimant had the residual functional capacity for all exertional activities, but would be limited to unskilled work. (*Id.*). He also found that Deerfield's complaints and statements regarding the intensity, persistence and limiting effects of his symptoms were not credible. (R. 23). At step four, the ALJ found that claimant was unable to perform his past relevant work as a bartender. (R. 25).

However, ALJ Boyle found, at step five, that as of his date last insured claimant was capable of performing jobs that existed in significant numbers in the national economy. (*Id*.). Accordingly, the ALJ concluded that Deerfield was not under a disability as defined in the Act at any time from June 15, 1999, the alleged onset date, through December 31, 2003, the date last insured. (R. 26).

Deerfield contends that ALJ Boyle erred in his analysis. First, claimant argues the ALJ did not afford the proper weight to the opinions of his treating physicians. He also argues that ALJ Boyle failed to consider all of his medications and related side effects. Next, Deerfield contends that the ALJ made an improper medical judgment in his RFC finding, and did not analyze claimant's RFC as required by Social Security Ruling ("S.S.R.") 96-8p. Finally, Deerfield argues that the ALJ improperly discounted his statements regarding the intensity, persistence and limiting effects of his symptoms and did not fully and fairly develop the record with respect to his credibility. We begin with claimant's arguments regarding the weight afforded to the opinions of his treating physicians.

## V.     LEGAL ARGUMENTS

### A.     Medical Evidence

Pursuant to 20 C.F.R. § 404.1527(d), the ALJ must evaluate every medical opinion. If a treating source's opinion is not given "controlling weight," the ALJ must "give good reasons" for the weight given to that opinion. 20 C.F.R. § 404.1527(d)(2).

Here, claimant primarily argues that ALJ Boyle erred by failing to address Dr. Teas' opinion in the January 26, 2006 letter that he would be "unlikely to succeed in full

24

time employment."  The ALJ recognized this opinion and elected not to accord it controlling weight, "notwithstanding the fact that [the doctor] followed the claimant since October 2002."  (R. 24).  He further noted that Dr. Teas' letter "does not include a diagnosis and [the doctor] relies on, in large part, the claimant's subjective complaints in concluding that claimant had low tolerance to stress or confrontation and could not work."  (*Id.*).  Accordingly, ALJ Boyle explained why he gave little weight to this opinion and remand on this basis is not warranted.  *See Diaz*, 55 F.3d at 308 (stating that an ALJ could consider a portion of a doctor's diagnosis which appears to be based on a claimant's own statements as less significant than the doctor's other findings) (*citations omitted*).

We also find that the ALJ sufficiently explained his election to give little weight to the 2006 RFC assessment.  Among other things, the ALJ found that Dr. Teas' opinion is not consistent with claimant's testimony that he watches his grandchild, and there "is no evidence of a disabling mental condition."  (R. 24).  Therefore, claimant's request that we remand this case for further consideration of Dr. Teas' 2006 opinions is denied.  *See e.g. Estok v. Apfel*, 152 F.3d 636, 640 (7th Cir. 1998) ("A retrospective diagnosis may be considered only if it is corroborated by evidence contemporaneous with the eligible period."); *Dixon*, 270 F.3d at 1177 (affirming grant of summary judgment in favor of the Commissioner where the ALJ elected to give treating physician's opinion little weight because it was not supported by medical findings).

Next, Deerfield argues that the ALJ did not recognize Dr. Teas' opinions, set forth in this treatment notes and the 2003 RFC, regarding his symptoms and treatment.

Specifically, claimant contends that the ALJ ignored evidence of his "fear of leaving his home, recurrent panic attacks, difficulty thinking or concentrating, mood disturbance, sleep disturbance, social withdrawal or isolation and decreased energy."  ALJ Boyle noted that during 2002 and 2003, "Dr. Teas progress notes show [that claimant reported]. . . . thought racing and marked insomnia. . . . reported that he had a couple of good friends, but did not go out much . . . complained of becoming much more depressed . . . with thoughts of suicide. . . . [s]leep was fair, energy low, and concentration poor."  (R. 23).  He also observed that on April 4, 2003 claimant's "most prominent symptoms were dysphoria and irritability" and that "[c]oncentration was a long term problem and low energy."  (*Id.*).  However, ALJ Boyle did not explain the weight given to these opinions as required by 20 C.F.R. § 404.1527(d)(2).  Moreover, the ALJ did not mention Dr. Teas' opinions regarding claimant's medication regime, as well as his anxiety and functional limitations.

As the Seventh Circuit has explained, an ALJ may not selectively consider medical reports, especially those of treating physicians, but must consider "all relevant evidence."  *Clifford*, 227 F.3d at 871; *see also Myles v. Astrue*, 2009 U.S. App. LEXIS 20073, *13 (7th Cir. Sept. 9, 2009).  It is not enough for an ALJ to address a portion of the medical report since the failure to address a treating physician's report in its entirety "prevents this court from tracing the ALJ's reasons for discounting it."  *See Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000).  Here, ALJ Boyle failed to address Dr. Teas' opinions regarding the side effects and effectiveness of claimant's medication, or explain the weight given to his opinions regarding claimant's depression and related

limitations.  On remand, the ALJ must explain his reasons for discounting Dr. Teas'

opinions.  *See Mulligan v. Astrue,* 2009 U.S. App. LEXIS 15432, *14 (7th Cir. July 13,

2009) ("An ALJ who discounts the opinion of the treating physician must articulate good

reason for doing so.") (*citing Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007)).  The

ALJ should also clarify the limited effects, if any, of claimant's ADHD and documented

refusal to take medication for that condition.

    Deerfield also argues that the ALJ failed to address Dr. Teas' diagnosis of panic

disorder and general anxiety disorder in the 2003 RFC.  (R. 168).  Although the ALJ did

not specifically mention the 2003 RFC assessment, he noted claimant's diagnoses of

panic disorder, agoraphobia, personality disorder, anxiety disorder and depression.  (R.

22, 24).  He also recognized  Dr. Teas' December 15, 2003 progress note indicating

"no change in [Deerfield's] condition but some situational depression" and that claimant

"gave [the doctor] a report . . . to fill out on behalf of his attorney."  (R. 149).  Thus, the

government argues that the ALJ's failure to mention the 2003 RFC is excusable

because "the ALJ clearly addressed a similar opinion from Dr. Teas."  *See Dixon,* 270

F.3d at 1176 (holding that an ALJ "is not required to address every piece of evidence or

testimony, but must provide some glimpse into [his] reasoning.") (*quotations omitted*).

While we are inclined to credit the government's argument, this Court has already found

that remand is warranted.  Accordingly, we instruct the ALJ to address claimant's 2003

RFC on remand.

    We are also persuaded by claimant's contention that the ALJ failed to explain the

conflict, if any, between the opinions of Dr. Hilger and Dr. Tomassetti.  In discounting

Dr. Hilger's opinions regarding Deerfield's potential to perform work related activities, the ALJ noted that "[t]he State Agency psychologists disagreed." (R. 24). As an initial matter, we note that Dr. Hilger is a clinical psychologist who examined claimant on behalf of the DDS - a state agency. (R. 176). Dr Tomassetti, who also examined claimant on behalf of the DDS, concluded that claimant suffered from anxiety, psychological or behavioral abnormalities, recurrent obsessions or compulsions, and severe panic attacks occurring on the average of at least once per week, but did not offer an opinion as to claimant's function limitations. (R. 181-86, 191). We agree with claimant's contention that the conflict between these opinions is not obvious. On remand, the ALJ must articulate the conflict between the opinions of Dr. Hilger and Dr. Tomassetti. Claimant further contends that the ALJ erroneously relied on Dr. Kettering's report, which did not indicate a disabling condition, to discount Dr. Hilger's conclusions. (R. 24). As claimant explains in his motion, Dr. Kettering's report is potentially inconsistent. The ALJ should attempt to resolve these inconsistencies on remand.

Although claimant does not directly address this in his brief, this Court is also troubled by the ALJ's statement that "[a]lthough the claimant receives treatment for anxiety, it was drug related before December 31, 2003." (R. 23). It is well established that an ALJ should not "succumb to the temptation to play doctor and make [his] own independent medical findings." *Rohan v. Chater*, 98 F.3d 969, 970 (7th Cir. 1996) (*citations omitted*). Moreover, ALJ Boyle's finding is not entirely consistent with claimant's numerous diagnosis of chronic anxiety and Dr. Teas' opinion that claimant

"has been chronically anxious his entire lifetime."  (R. 142).  The ALJ should consider claimant's anxiety disorder on remand.

### B.      Residual Functional Capacity

Deerfield also contends that the ALJ failed to explain how he arrived at his RFC finding.  A claimant's RFC is the most he can still do despite his limitations. 20 C.F.R. § 404.1545.   Here, ALJ Boyle concluded that claimant has the RFC for all exertional activities, but is limited to unskilled work.  (R. 22).  Deerfield argues that the ALJ did not consider his memory limitations in connection with this analysis.  Claimant further argues that the ALJ's RFC finding ignores his diagnosis of "severe anxiety and agoraphobia" and Dr. Teas' consistent belief that claimant's medical related work absences would prevent him from maintaining substantial gainful activity.

The determination of an RFC is reserved to the Social Security Administration. *Diaz*, 55 F.3d at 306 n. 2  (*citing* 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2)).  However, the ALJ's RFC assessment must be "based on all of the relevant evidence" in the case record.  20 C.F.R. § 404.1545.  "The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." S.S.R. 96-8p.  A claimant's mental limitations must be part of an RFC assessment because diminished mental ability may reduce a claimant's ability to do past work and other work.  *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008) (*citations omitted*). Where, as here, claimant presents evidence that he suffers from a mental impairment, the ALJ must follow a "special technique" prescribed by the regulations. 20 C.F.R. §

404.1520a; *see also, Craft,* 539 F.3d at 676. The ALJ is required to document application of this technique in his decision. 20 C.F.R. § 404.1520a(e).

Although ALJ Boyle may have considered evidence of claimant's mental limitations, it appears that the ALJ did not review the results of claimant's WMS-III and WAIS-III tests, or his testimony regarding memory limitations. On remand, the ALJ must determine if there are any functional limitations resulting from claimant's memory limitations, as well as his agoraphobia and anxiety. He should also discuss Dr. Teas' opinion that Deerfield would be required to miss work more than "three times" a month. (R. 171). *See Spaulding v. Barnhart*, 2007 WL 1610445. (finding that if plaintiff required more than two or three sick days per month, she would be unemployable).

### C.    Credibility

Next, Deerfield argues that the ALJ's credibility determination was in error. An ALJ's "assessment of the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on his ability to function must be based on a consideration of all the evidence in the case record," including "medical signs and laboratory findings." S.S.R. 96-7p; *see also Giles v. Astrue*, 483 F.3d 483, 488 (7th Cir. 2007) (relying on S.S.R. 96-7p). In order to succeed on this argument, claimant must overcome the special deference we afford credibility determinations. *See Powers v. Apfel,* 207 F.3d 431, 435 (7th Cir. 2000). Because the ALJ is in a superior position to assess the credibility of a witness, we will reverse an ALJ's credibility determination only if claimant can show that it was "patently wrong." *Id.*; *see also, Edwards v. Sullivan,* 985 F.2d 334, 338 (7th Cir. 1993) (recognizing that a reviewing

court should not reconsider credibility determinations made by the ALJ as long as they find some support in the record).

ALJ Boyle found that "the objective medical evidence does not fully support the claimant's complaints." (R. 23). This is not, in and of itself, a sufficient basis to discredit claimant's statements regarding the intensity, persistence and limiting effects of his condition. An ALJ may not discredit a claimant's testimony about his pain and limitations solely because there is no objective medical evidence supporting it. *Villano*, 556 F.3d at 562 (*citing* S.S.R. 96-7p; 20 C.F.R. § 404.1529(c)(2)). However, ALJ Boyle recognized certain instances where the medical records contradicted Deerfield's complaints. *See Edwards,* 985 F.2d at 338 (finding that a credibility determination sufficiently supported by the record is not "patently wrong."). For instance, the ALJ noted that on April 3, 2004 - less than eight months before his date last insured - Deerfield "told Dr. Teas that he started to recover to a degree . . . slept 7-8 hours a night, [had] no side effects from Effexor, and felt hope for a change." (R. 23). The ALJ also relied on the fact that Deerfield watched his grandchild at his house and informed Dr. Kettering that he attends numerous musicals and plays. (R. 23).

Claimant argues that the ALJ erred by relying on Dr. Kettering's statements because they "were made post-hearing, and the ALJ never asked plaintiff about this seeming contradiction." However, claimant was aware of Dr. Kettering's assessment and had an opportunity to correct the record prior to the date on which ALJ Boyle issued his decision. Claimant was also represented by counsel. Moreover, while the ALJ has a duty to probe into the relevant facts and create a full and fair record, he is not required

to ensure that claimant's best case is presented.  *See Rockett v. Shalala* 1994 U.S. Dist. LEXIS 3087, *14 (N.D. Ill. December 15, 1994) (rejecting similar argument). Nevertheless, and because we have already found that remand is warranted, we instruct the ALJ to consider claimant's post-hearing affidavit on remand and, to the extent necessary, reconsider his credibility determination.

## VI.    CONCLUSION

For the reasons stated above, Deerfield's motion for summary judgment is granted in part and denied in part,  the Commissioner's motion for summary judgment is denied, and this case is remanded to the Social Security Administration for further proceedings consistent with this opinion.  It is so ordered.

**ENTERED:**

_____

**MICHAEL T. MASON**
**United States Magistrate Judge**

**DATED: October 23, 2009**